## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | Chapter 13 |
| | : | |
| THOMAS JOHNSON, | : | |
| | : | Bankruptcy No. 19-10256-AMC |
| DEBTOR | : | |

Ashely M. Chan, United States Bankruptcy Judge

### OPINION

### I.  INTRODUCTION

The debtor, Thomas Johnson ("Debtor"), seeks an award of actual and punitive damages under 11 U.S.C. § 362(k) against Samuel Zewdi ("Mr. Zewdi") for willful violations of the automatic stay based upon Mr. Zewdi's interference with the Debtor's possession of his residence and disposal of substantially all of the Debtor's personal belongings after the Debtor filed for bankruptcy. Because Mr. Zewdi wrongfully obtained possession of, and exercised control over, property of the estate with knowledge of the bankruptcy which caused the Debtor to suffer significant economic and emotional damages, the Court finds that Mr. Zewdi committed egregious willful violations of the automatic stay. Accordingly, the Court awards $50,458 in actual damages against Mr. Zewdi, including $11,179 for property damage and lost wages, $15,000 for emotional distress, and $24,279 for attorneys' fees and costs. Furthermore, because Mr. Zewdi's reprehensible conduct constituted a total disregard for the automatic stay, the Court awards the Debtor $20,000 in punitive damages.

### II.  FACTUAL/PROCEDURAL BACKGROUND

On October 31, 1973, Eva Mae Coleman (nee Johnson) ("Mrs. Coleman"), the Debtor's mother, and Thomas Coleman ("Mr. Coleman"), the Debtor's father, purchased real property

1

located at 6426 North Beechwood Street, Philadelphia, PA ("the Property"),[1] where the Debtor

resided from age eight until adulthood, when he eventually moved out. Ex. D-1; Ex. D-2; Tr.

Mar. 12, 2019 Hrg. ("Mar. 12 Tr.") 15:24-16:15, 17:24-18:3, 18:21-19:7, 21:1-3. On December

21, 1994, Mrs. Coleman died without a will, leaving Mr. Coleman the sole owner of the

Property. Ex. D-3; Mar. 12 Tr. 19:17-18. On August 15, 2005, Mr. Coleman died without a will.[2]

Ex. D-4; Mar. 12 Tr. 19:19-20.

By 2015, the Debtor had moved back into the Property after discovering that Devon Rainford

("Mr. Rainford"), a stranger unrelated to the Debtor or his parents, had recorded a fraudulent

deed dated February 15, 2006 ("the Deed") purporting to transfer the Property to himself from

the Debtor's deceased parents. Ex. D-6; Mar. 12 Tr. 22:8-12, 23:3-24:2, 25:11-25. On June 8,

2015, Mr. Rainford filed a complaint in ejectment against the Debtor in the Philadelphia County

Court of Common Pleas ("State Court"), which the State Court ultimately dismissed on the basis

that the Deed was fraudulent. Ex. D-5; Mar. 12 Tr. 30:7-10.

Since then, the Debtor has continuously resided at the Property except for a seven month

period from late September 2017 to late April 2018 when he was taking care of his sick sister in

North Carolina.[3] Mar. 12 Tr. 30:11-32:11. However, on August 16, 2017, shortly before the

Debtor's departure for North Carolina, the City of Philadelphia sold the Property to Mr. Zewdi,

who resided in California, for $28,000 on account of delinquent real estate taxes. Ex. D-7 ¶¶ 32-

33; Mar. 12 Tr. 33:13-21; Tr. April 23, 2019 Hrg. ("Apr. 23 Tr.") 49:4-6. The Sheriff of

Philadelphia County acknowledged the sheriff's deed on September 27, 2017. Ex. D-7 ¶ 34.

---

[1] The Property was held by the Debtor's parents as tenants by the entireties. Ex. D-1.
[2] After Mrs. Coleman passed away, Mr. Coleman remarried. Ex. D-7 ¶ 13. Upon his death, Mr. Coleman was
residing in Delaware. *Id.* at ¶ 14. Accordingly, pursuant to Delaware intestacy law, Mr. Coleman's second wife ("the
Second Wife") inherited a life estate in any real estate he owned and his children inherited the remainder. 12 Del. C.
§ 502(4); 12 Del. C. § 503. The Second Wife, who also lived in Delaware, passed away several years ago, leaving
the Debtor and his two sisters each with a 1/3 interest in the Property. Ex. D-7 ¶¶ 18-19.
[3] No one else was living at the Property when the Debtor left for North Carolina. Mar. 12 Tr. 65:1-3.

When the Debtor returned to Philadelphia in April 2018, he learned about the tax sale after finding the Property boarded up, gutted, and emptied of all his personal belongings. Mar. 12 Tr. 32:1-16, 33:3-12.

On June 21, 2018, the Debtor, through his attorney at Philadelphia Legal Assistance,[4] filed a petition in State Court to redeem the Property prior to the expiration of the statutory redemption period.[5] Ex. D-7; Mar. 12 Tr. 33:22-34:1. On October 4, 2018, the State Court entered an order granting the Debtor the right to redeem the Property and setting the redemption amount at $32,891.73 ("Redemption Order"). Ex. D-8.

On January 15, 2019, the last day of the redemption period,[6] the Debtor filed a voluntary petition under chapter 13 of the Bankruptcy Code, as well as a chapter 13 plan ("the Plan") which proposed to pay Mr. Zewdi's entire secured claim, plus interest, totaling $35,461.28.[7] Case No. 19-10256 ECF Doc. ("ECF") 1, 6; Mar. 12 Tr. 83:21-22. On January 18, 2019, Mr. Zewdi's then-counsel, Douglas Stern, Esq. ("Mr. Stern"), received notice of the bankruptcy filing in the mail and from Debtor's counsel. Mar. 12 Tr. 80:11-17, 86:1-3. That same day, Mr. Stern emailed Mr. Zewdi a copy of the Debtor's chapter 13 petition and called him to explain that, because a stay was in place, Mr. Zewdi could take no action to recover the Property unless

---

[4] Philadelphia Legal Assistance is a federally-funded legal services program providing free legal services to low-income individuals in Philadelphia. ECF 53 Decl. re Attys' Fees ¶ 1.

[5] Under Pennsylvania law, pursuant to the Municipal Claims and Tax Lien Act, the owner of a property sold under a tax or municipal claim, his assignees, or any party whose lien or estate has been discharged retains the right to redeem the property within nine months of acknowledgement of the sheriff's deed issued in connection with the sale provided that the property was continuously occupied by the same person or family unit as a residence for 90 days prior to the sale and continued to be so occupied on the date of acknowledgment of the sheriff's deed. 52 P.S. §7293(a), (c); *In re Pittman*, 549 B.R. 614, 616-17 (Bankr. E.D. Pa. 2016). During the allowed redemption period, the owner may continue in possession of the property and the purchaser merely holds defeasible title in the property until the redemption period expires. *In re Pittman*, 549 B.R. at 620-24 (discussing numerous Pennsylvania cases finding owner retains possession of the property during the redemption period).

[6] The redemption period had been extended as reflected in the Redemption Order. Ex. D-8; Apr. 23 Tr. 75:17-25.

[7] As a third-party purchaser at a sheriff's sale, Mr. Zewdi holds a secured claim for repayment of the redemption amount. *See In re Pittman*, 549 B.R. at 628.

he filed a motion for relief from the stay or the case got dismissed.[8] Ex. R-2; Mar. 12 Tr. 12:10-12, 81:5-7, 81:20-24, 88:6-15.

One month later, on Sunday, February 17, 2019, Mr. Zewdi flew from California to Philadelphia, went straight to the Property, and called the police to remove the Debtor because "the redemption order was failed by Mr. Thomas Johnson…" and "he didn't comply with the redemption." Apr. 23 Tr. 49:13-50:13, 56:1-17. After banging on the Debtor's door with six police officers, Mr. Zewdi yelled at the Debtor that he was trespassing and demanded that he leave the Property. Mar. 12 Tr. 39:1-13, 40:13-14, 99:15-17. The Debtor showed the officers and Mr. Zewdi the Redemption Order and his bankruptcy paperwork and verbally informed them that he had filed for bankruptcy. *Id.* at 39:24-40:8, 41:1-11, 101:20-24. Eventually, a sergeant arrived who told the Debtor and Mr. Zewdi that, because this was a civil matter, the police would not force the Debtor to vacate. *Id.* at 40:22-25.

The same day, Mr. Zewdi called PECO in order to get the Property's electrical service terminated due to faulty wiring.[9] Apr. 23 Tr. 59:1-7, 59:25-60:14, 62:19, 63:22-64:5. However, PECO would not permit the purchaser of the Property to make a complaint. *Id.* at 59:25-60:3. As a result, Mr. Zewdi complained about the electricity issue to one of the Debtor's neighbors ("the Neighbor"). *Id.* at 59:25-60:18, 62:19-22, 64:1-5.

Later that evening, Mr. Zewdi returned to the Property a second time, accompanied by several police officers, to force the Debtor to vacate the Property. Mar. 12 Tr. 42:3-10, 91:11-16, 92:5-8. Mr. Zewdi told the police officers that the Debtor was a squatter. *Id.* at 92:5-8. The

---

[8] Mr. Zewdi admits he first learned of the Debtor's bankruptcy filing on January 18, 2019. Mar. 12 Tr. 12:10-12.
[9] After the Debtor initially moved back into the Property in 2015, he discovered that someone had "rigged" the electricity, meaning that the Property had electric service illegally. Mar. 12 Tr. 26:19-23, 27:6-7. Over the last year, the Debtor attempted to rewire the electricity in the Property to make the connection legal and had tried to get the electric bill put in his name to no avail, presumably due to the tangled title issues. *Id.* at 60:2-11, 61:1-8.

Debtor again explained to the police and Mr. Zewdi that he had filed for bankruptcy and had a Redemption Order. *Id.* at 92:9-19, 93:2-8. As a result, another sergeant instructed the Debtor and Mr. Zewdi to speak with a detective at the local precinct. *Id.* at 42:13-25, 92:17-19. At the police station, the Debtor showed the detective his bankruptcy paperwork and explained his redemption rights. *Id.* at 43:17-20, 44:2-7. Nevertheless, the detective decided that the Debtor had no right to possession and informed him that he would be arrested if he returned to the Property. *Id.* at 43:13-17, 45:4-20.

On Monday, February 18, 2019, Presidents' Day, the Debtor spoke with his counsel, who advised him to return to the Property. *Id.* at 45:22-24, 46:5-8, 51:10-13, 52:15-25. Fearful of being arrested, the Debtor first called the police to ask for permission to do so. *Id.* at 52:15-17. As a result, the Debtor met the police and Mr. Zewdi at the Property later that day. Mar. 12 Tr. 51:18-22, 52:4-5; Apr. 23 Tr. 57:3-16. While there, Mr. Stern advised Mr. Zewdi via text message that the automatic stay prohibited Mr. Zewdi from calling the police on the Debtor, forcing the Debtor out of the Property, and taking possession of the Property. Mar. 12 Tr. 82:25-83:11, 88:21-25; Apr. 23 Tr. 50:21-51:1, 57:9-16. In fact, Mr. Stern warned Mr. Zewdi that if he did not allow the Debtor back into the Property, Debtor's counsel would likely file an emergency motion for contempt.[10] Mar. 12 Tr. 83:8-11, 85:9-10.

At some point, the police instructed the Debtor to go back to the police station to make another statement. *Id.* at 52:4-8. While there, he told one of the lieutenants ("the Lieutenant") that he had filed for bankruptcy and had a Redemption Order. *Id.* at 52:9-12, 53:5-11. The Lieutenant also spoke with Debtor's counsel over the phone. *Id.* at 53:9-15. Nevertheless, the Lieutenant still threatened to arrest the Debtor and his housemate, Chandler Nelson ("Mr.

---

[10] Mr. Zewdi fully acknowledges that Mr. Stern "had text me [sic] February 18[th] the rights that this gentleman—that the debitor [sic] has, the rights and the violation of stay and what would take place." Apr. 23 Tr. 50:21-51:1.

Nelson"),[11] if they returned to the Property. *Id.* at 52:9-12, 53:18-25, 111:17-19, 112:1-2. As a result, the Debtor spent the night at his uncle's house while Mr. Nelson spent the night in his car. *Id.* at 46:19-20, 112:10-17.

The next morning, Tuesday, February 19, 2019, the Debtor went to the Property around 8:15-8:30 am because he had arranged to meet Mr. Zewdi at 9:00 am to retrieve his belongings. Mar. 12 Tr. 46:25-47:3; Apr. 23 Tr. 51:21-22, 56:19-20. Mr. Zewdi arrived at least an hour late. Mar. 12 Tr. 47:4-5; Apr. 23 Tr. 51:22-23. The Debtor had been unable to obtain a storage unit or a moving truck on such short notice and understandably needed additional time to make these arrangements. Mar. 12 Tr. 47:6-16. Although Mr. Zewdi initially told the Debtor that he would give him more time, at the conclusion of their conversation, he began removing items from the Property and piling them onto the front lawn. *Id.* at 47:15-24. The police subsequently arrived, but refused to stop Mr. Zewdi and his helpers as they continued to remove the Debtor's belongings from the Property. Mar. 12 Tr. 98:17-21, 104:7-13; Apr. 23 Tr. 54:3-5.

According to one of the Debtor's neighbors, by approximately 12:00 pm, "the whole sidewalk was full with entertainment center [sic], living room furniture, dining room furniture, baskets upon baskets and bags of clothes, and they [Mr. Zewdi and a few others] were still carrying stuff out." Mar. 12 Tr. 103:24-104:3. In fact, items from the Property were stacked 10 to 15 feet high on the front lawn and covered the entire sidewalk in front of the Property. *Id.* at 104:16-24. While Mr. Zewdi was disposing of the Debtor's belongings, Mr. Stern texted Mr. Zewdi advising him to let the Debtor back into the Property, but he refused to do so. *Id.* at 82:18-25, 89:1-10. Shortly thereafter, Debtor's counsel filed an emergency Motion for Contempt and Damages for Willful Violations of the Automatic Stay ("the Motion"). ECF 30, 31.

---

[11] Mr. Nelson had been staying with the Debtor since May 2018. Mar. 12 Tr. 110:9-14, 110:23-25.

Later in the afternoon, a trash truck pulled up, which it appears Mr. Zewdi or someone acting

on his behalf arranged, even though it was not the neighborhood's regular trash collection day.

Mar. 12 Tr. 106:4-24; Ex. D-11. Mr. Zewdi and his helpers then proceeded to dump substantially

all of the Debtor's personal property from the lawn and sidewalk into the trash truck. Mar. 12 Tr.

106:4-20, 107:15-16; *see* Ex. D-11.

At 3:00 pm, while Mr. Zewdi's helpers continued to throw away the Debtor's property, the

Court held a telephonic hearing on the Motion with Debtor's counsel and Mr. Zewdi. *See* ECF

32; Mar. 12 Tr. 104:25-105:9, 106:11-24, 131:17-20, 133:19-134:10. During the telephonic

hearing, the Court orally ordered Mr. Zewdi to stop throwing away the Debtor's belongings,

engaging in any other self-help remedies, and attempting to remove the Debtor from the

Property. Mar. 12 Tr. 131:21-132:1. Despite the Court's oral directive, Mr. Zewdi continued

throwing out the Debtor's belongings,[12] including his clothes, mattresses, a living room set, a

dining room set, his refrigerator, beds, dressers, sofas, forks, knives, spoons, cabinets, electric

heaters, and more, until after 4:00 pm.[13] *Id.* at 49:21-50:4, 105:6-9, 106:10-16, 107:16, 134:8-10.

On February 21, 2019, the Court entered an order memorializing its oral order from February

19 and scheduling a subsequent hearing on the Motion for March 5, 2019.[14] ECF 34. Shortly

thereafter, the Debtor returned to the Property. Mar. 12 Tr. 4:24-5:5. Around February 22, 2019,

the Debtor went to the emergency room on account of excruciating headaches, blurred vision,

and chest pains, which the hospital attributed to stress and high blood pressure. Mar. 12 Tr.

---

[12] In addition, Mr. Zewdi disposed of all Mr. Nelson's belongings as well, including his clothes, his bed, his dresser, a couch, a television, his degree, and family photos. Mar. 12 Tr. 111:9-15.

[13] The only items the Debtor was able to save were a television, his son's game, and some clothes. Mar. 12 Tr. 49:23-25, 107:15-16.

[14] The Order provided that "(1) Debtor, Thomas Johnson [sic] is entitled to possession of the Property located at 6426 N. Beechwood Street, Philadelphia, PA 19138. (2) Samuel Zewdi has no right to evict or eject Debtor, Thomas Johnson, from the Property and shall not engage in any self-help or otherwise attempt to remove Thomas Johnson from the Property located at 6426 N. Beechwood Street, Philadelphia, PA 19138. (3) A further hearing on this matter is set for March 5, 2019…"

54:10-11, 54:20-55:12; Apr. 23 Tr. 44:19-23. The Debtor does not typically experience high

blood pressure.[15] Mar. 12 Tr. 55:13-14.

The hearing on the Motion was subsequently continued to March 12, 2019. ECF 44. On

March 1, 2019, Mr. Zewdi retained new counsel, Anthony Frigo, Esq. ("Mr. Frigo"), to represent

him in the bankruptcy. ECF 47, Mot. to Continue Hrg ¶ 3. On March 12, 2019, an evidentiary

hearing on the Motion was held and the Debtor credibly testified regarding the emotional toll

that the events of February 17-19 had on him, stating that "this has been a nightmare, a living

hell" and that "he [Mr. Zewdi] just came in and threw my stuff out like I was -- like I was trash. I

seen [sic] squatters get -- better treatment than I was treated in my own property." Mar. 12 Tr.

48:17-20, 61:24. His testimony reflected the trauma of having police repeatedly called to his

home, having them threaten to arrest him multiple times if he returned to his own Property, and

having Mr. Zewdi wrongfully take possession of his childhood home and throw away his

personal belongings in front of his long-time friends and neighbors. *Id.* at 31:13-18, 46:5-13,

47:22-48:24, 49:13-20. These events deeply upset the Debtor and caused him to experience

stress, helplessness, humiliation, and shame. *Id.* at 47:24-48:14, 48:22-24, 49:5-20, 61:24-62:11.

The Debtor was understandably angry and fearful that Mr. Zewdi would return and try to evict

him, causing him many sleepless nights checking for Mr. Zewdi outside every few hours. *Id.* at

54:3-9, 56:8-11.

In addition, the Debtor missed nine to eleven days of work at his job with Thompson

Construction where he earned $17.00/hour, because he feared that Mr. Zewdi would return with

the police when he went to work. *Id.* at 54:3-6, 54:16-19, 55:17-21, 56:2-4. The Debtor would

normally have worked between eight to twelve hours on a given day. *Id.* at 56:5-7.

---

[15] The Debtor believes he has not been billed for the hospital's services because the cost has been covered under a program which provides free and reduced cost medical care to low-income individuals. Apr. 23 Tr. 46:5-16.

At the conclusion of the hearing, the Court found that Mr. Zewdi had committed an egregious willful violation of the automatic stay. *Id.* at 138:17-139:17. In particular, the Court was shocked and dismayed by video footage, taken by one of the Debtor's neighbors, of Mr. Zewdi and his helpers dumping the Debtor's belongings into the trash truck. Mar. 12 Tr. 140:6-7; *see* Ex. D-11. As a result, the Court instructed the Debtor to file an itemized statement of his requested damages by March 26, 2019 and invited Mr. Zewdi to file any objection by April 9, 2019. Mar. 12 Tr. 139:24-140:2, 143:5-16. A hearing to determine the amount of damages was set for April 16, 2019. *Id.* at 143:16-17. The hearing was subsequently continued by agreement of the parties to April 23, 2019. ECF 56.

Thereafter, on March 19, 2019, after someone called to report faulty electrical wiring at the Property, PECO came out to the Property and clipped its electrical wire in three places, causing the Property to lose electrical service. Apr. 23 Tr. 20:2-11, 22:2-6, 23:1. Mr. Zewdi believes that the Neighbor called PECO to make a complaint about the faulty wiring after he told him about it. *Id.* at 59:8-13, 60:7-18.

On March 26, 2019, the Debtor filed an itemized statement with his requested damages ("the Damages Statement"). ECF 52, 53. The Debtor requested $8,414 to compensate him for damages to his personal property resulting from the automatic stay violations, including (1) $2,210 for the estimated value of the bulk of his personal property, including four televisions,[16] a couch, two beds, a stove, a refrigerator, a table, two microwaves, a laptop, a tablet, and used clothing, as reflected on his bankruptcy Schedule B;[17] (2) $3,500 for the value of new cabinets he had

---

[16] The Debtor is not seeking to recover any damages for the television that he managed to retrieve from the Property. Apr. 23 Tr. 34:10-20, 79:23-80:4.

[17] In Schedule B, the household goods and furnishings, including the televisions, couch, beds, stove, refrigerator, table, and microwaves, are valued collectively at $1,800, the laptop and tablet are valued at $140, and the used clothing is valued at $270. Ex. D-9, Sch. B.

purchased and planned to install in his home; (3) $800 to replace electric heaters which were

fixtures attached to the Property; (4) $125 to replace the refrigerator; (5) $200 for the estimated

cost of replacing two microwaves; (6) $179 for having a locksmith come to the Property on

February 21, 2019 to replace locks destroyed by Mr. Zewdi; and (7) $1,400 to replace a king-

sized bed frame, box-spring, and mattress. Damages St. 3-4. He also requested $1,700 in lost

wages[18] and $3,700 to repair the wire cut by PECO. *Id.* at 4. The Debtor further sought $24,279

in attorneys' fees and costs[19] to be paid to Philadelphia Legal Assistance, $18,000 in emotional

distress damages, and $30,000 in punitive damages.[20] *Id.* at 4, 8, 10.

On April 4, 2019, Mr. Frigo filed a motion to withdraw as Mr. Zewdi's attorney ("Motion to

Withdraw"), stating that Mr. Zewdi (a) had discharged counsel and planned to "come to

Philadelphia to represent himself;" (b) was not heeding counsel's advice; and (c) was refusing to

cooperate with counsel. ECF 58, Mot. to Withdraw ¶¶ 5(a)-(c). On April 18, 2019, nine days

after the deadline, Mr. Zewdi filed a *pro se* response to the Damages Statement objecting to an

award of damages on the basis that he had not understood the implications of the automatic stay

at the time he took actions to recover the Property; that his call to PECO did not result in PECO

cutting the electric service; and that he did not see cabinets, electric heaters, or a king size bed

frame, box spring, or mattress in the Property.[21] ECF 65 *Pro Se* Resp. 1-3. On April 22, 2019,

---

[18] The Debtor estimated that he missed ten days of work and would have worked an average of ten hours per day.
Damages St. 4.

[19] Consisting of $24,024 in fees and $255 in costs. Damages St. 10. Debtor's counsel arrived at $24,024 in fees by
multiplying the 57.2 hours she spent on this matter by her hourly billing rate of $420 per hour, which she supported
with a sworn declaration from her supervising attorney and a sworn declaration from the chairperson of her
organization's Attorney Fees Committee explaining the Philadelphia Legal Assistance fee schedule. Decl. re Atty's
Fees ¶¶ 6, 8, Ex. A, B, C.

[20] The Debtor also requested $27,769 on account of damages suffered by Mr. Nelson. Damages St. 13.

[21] Mr. Zewdi also appeared to contest the Debtor's right to redeem the Property on the basis that he did not believe
the Debtor had resided at the Property for a sufficient period of time. *Pro Se* Resp. 1. However, the State Court had
already entered the Redemption Order, thereby determining the Debtor does satisfy the qualifications for redeeming
the Property. Ex. D-8. This Court has no authority to sit in review of state court judgments. *In re Stoltzfus*, No. 09–
11904bf, 2009 WL 2872860, at *4 (Bankr. E.D. Pa. March 30, 2009).

Debtor's counsel filed a proof of claim on behalf of Mr. Zewdi in the amount of $32,891.73.
ECF 66.

On April 23, 2019, the Court granted the Motion to Withdraw and a hearing was held on the
amount of damages to award the Debtor on account of the willful stay violations. ECF 67, 69. At
the hearing, the Debtor affirmed the accuracy of most of the estimates set forth in the Damages
Statement, updated the Court that he had only ended up paying $1,700 to restore the electrical
service, and requested another $1,300 to repair multiple damaged doorframes which Mr. Zewdi
had broken down with a sledgehammer.[22] Apr. 23 Tr. 18:21-19:4, 19:10-22, 24:10-16, 35:2-16,
37:13-24. Additionally, the Debtor supplemented his testimony regarding the emotional impact
of the stay violations, explaining that he still lives in constant fear of Mr. Zewdi attempting to
remove him from the Property again and that he has become a more impatient, angry person as a
result of the stay violations. *Id.* at 25:5-21.

At the hearing, in addition to objecting to the Court awarding any damages, Mr. Zewdi
testified, in relevant part, that he has flown back and forth from California to Pennsylvania about
seven times since purchasing the Property at a cost of $700-$800 per flight, that he bought the
Property so that he could move his family to a less expensive area, that he borrowed $20,000
from his father and cousin to purchase the Property, and that he works full-time as a
merchandiser for Pepsi-Cola making $16/hour. *Id.* at 52:18-53:1, 68:7-8, 70:6-20, 71:1-14.

## III.    DISCUSSION

Having determined at the March 12 hearing on the Motion that Mr. Zewdi committed
egregious willful violations of the automatic stay, the Court will, referencing applicable legal
principles, elaborate on this holding and determine the appropriate amount of damages to award

---

[22] The Debtor had initially forgotten to include this amount in his Damages Statement. Apr. 23 Tr. 19:10. Mr. Zewdi
had broken down the front door and all the bedroom doors. *Id.* at 35:2-14.

the Debtor on account of the violations. Ultimately, as reflected in the Court's ruling at the March 12 hearing, Mr. Zewdi violated the automatic stay by repeatedly enlisting law enforcement to cause the Debtor's wrongful ejectment from the Property, throwing away substantially all of the Debtor's personal property,[23] and attempting to interfere with his electrical service. These violations were willful because Mr. Zewdi took each of these actions intentionally with knowledge of the bankruptcy. Therefore, pursuant to §362(k), the Debtor is entitled to recover actual damages resulting from these stay violations, including damages for emotional distress and attorneys' fees. The circumstances also justify awarding punitive damages against Mr. Zewdi to punish and deter his, as well as other tax sale purchasers', outrageous defiance of the Bankruptcy Code.

### A. Applicable Legal Principles

The automatic stay is one of the fundamental debtor protections supplied by the Bankruptcy Code. *Malloy v. J&V Developers, Inc. (In re Malloy),* 572 B.R. 551, 555 (Bankr. E.D. Pa. 2017). Under §362(a)(3), a petition operates as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[24] Section 362(k)(1) provides that "an individual injured by any willful

---

[23] In fact, Mr. Zewdi does not dispute that he violated the automatic stay by calling the police several times, causing Debtor's removal from the Property, and throwing away his personal property into a trash truck. Apr. 23 Tr. 12:10-17, 14:15-20.

[24] Section 362(a) also provides that a bankruptcy petition operates as an automatic stay against (**1**) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title; (**2**) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; (**4**) any act to create, perfect, or enforce any lien against property of the estate; (**5**) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; (**6**) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title; (**7**) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and (**8**) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may

12

violation of a stay shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." In order to establish a claim pursuant to §362(k)(1), the moving party must show by a preponderance of the evidence that (1) the creditor violated the automatic stay; (2) the violation of the stay was willful; and (3) the willful violation caused the debtor some injury. *Dean v. Carr (In re Dean),* Bankr. No. 1:11-bk-05680MDF, Adv. Nos. 1:11-ap-00481MDF, 1:11-ap-00505MDF, 2012 WL 4634291, at *5 (Bankr. M.D. Pa. Oct. 1, 2012); *In re Miller,* 447 B.R. 425, 433, n. 10 (Bankr. E.D. Pa. 2011).

A creditor "willfully" violates the stay when he or she does so with knowledge of the bankruptcy. *In re Malloy,* 572 B.R. at 555. "Willfulness does not require that the creditor intend to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional…" *Vu v. Lin (In re Vu),* 591 B.R. 596, 603 (Bankr. E.D. Pa. 2018) (quoting *Lansdale Family Rests., Inc. v. Weis Food Serv. (In re Lansdale Family Rests., Inc.),* 977 F.2d 826, 829 (3d Cir. 1992)); *In re Malloy,* 572 B.R. at 555 (citing *Lansaw v. Zokaites (In re Lansaw),* 853 F.3d 657, 664 n. 4 (3d Cir. 2017)). A good faith mistake of law or dispute as to the creditor's right to take the action does not negate the willfulness of the violation. *In re Nixon,* 419 B.R. 281, 288 (Bankr. E.D. Pa. 2009); *Dean v. Carr (In re Dean),* 490 B.R. 662, 673 (Bankr. M.D. Pa. 2013) ("'[A] creditor's good faith belief that it had a right to [a debtor's] property is irrelevant' to the question of whether the creditor has willfully violated the stay.").

---

determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

### B.  Mr. Zewdi Willfully Violated the Automatic Stay

Mr. Zewdi violated the automatic stay pursuant to §362(a)(3) by interfering with the

Debtor's possession over property of the estate on multiple occasions.[25] Mr. Zewdi's calls to the

police and his repeated demands that the Debtor vacate the Property were designed to, and did,

cause the Debtor's removal from the Property, allowing Mr. Zewdi to improperly obtain

possession over property of the estate. Even worse, Mr. Zewdi impermissibly exercised control

over property of the estate by permanently disposing of substantially all of the Debtor's personal

property.[26] Finally, Mr. Zewdi inexcusably attempted to exercise control over the Property and

effectively force the Debtor to relinquish possession by causing termination of the Property's

electrical service.[27]

Second, the Debtor has proven that these stay violations were willful. Mr. Zewdi's

actions to take possession of and exercise control over property of the estate were intentional and

done with knowledge of the Debtor's bankruptcy filing, which he received from Mr. Stern on

January 18, 2019. These facts alone satisfy the Debtor's burden as to the willfulness of the stay

violations. However, the Court also finds that, not only did Mr. Zewdi know about the

bankruptcy when he violated the stay, but he knew that his actions violated the Debtor's rights

under the Bankruptcy Code. Mr. Stern credibly testified that, on January 18, 2019, he explained

---

[25] The parties have never disputed that the Property and Debtor's personal property, which was thrown out by Mr. Zewdi, constituted property of the Debtor's estate. Section 541(a)(1) provides that estate property includes all legal or equitable interests of the Debtor in property as of the commencement of the case.

[26] In addition, by attempting to enforce his secured interest in the Property by taking possession of it, Mr. Zewdi necessarily violated §362(a)(1), staying the commencement or continuation of an action to recover a claim against the Debtor that arose prepetition; §362(a)(2), staying any act to enforce against property of the debtor any lien securing a claim that arose prepetition; and §362(a)(6), staying any act to collect or recover a claim against the Debtor that arose prepetition.

[27] While PECO initially refused to act on Mr. Zewdi's complaint, his call to the Neighbor was designed to, and did, trigger the Neighbor to complain to PECO, which resulted in PECO cutting the electrical wires to the Property. In fact, the Court finds that Mr. Zewdi called the Neighbor for the very purpose of having the Neighbor report the Property's faulty wiring to PECO after he was prevented from doing so himself. PECO only came to the Property as a result of the call that Mr. Zewdi made to the Neighbor. Thus, his failed call to PECO and his call to the Neighbor reflect continued efforts to interfere with Debtor's possession of the Property in violation of the stay.

the implications of the automatic stay to Mr. Zewdi over the telephone. Mr. Stern also told Mr. Zewdi multiple times on February 18 and 19 that the automatic stay prohibited him from taking actions against the Debtor or to recover the Property. Mr. Zewdi had ample opportunity to not throw out the Debtor's personal belongings and to let the Debtor back into the Property, but he refused to heed his counsel's advice. Accordingly, the Court finds that the Debtor willfully defied the automatic stay provisions of the Bankruptcy Code.

Finally, the Debtor's removal from his home under threat of arrest, the disposal of substantially all of his personal possessions in a humiliating manner, and the termination of his electrical service clearly caused the Debtor to suffer actual financial damages, as well as emotional harm. Accordingly, having determined that Mr. Zewdi committed some of the most egregious, offensive willful stay violations that this Court has ever encountered, the Court will now proceed to determine the appropriate amount of damages to award the Debtor on account of these violations.

### C. Actual Damages

Section 362(k)(1) allows a debtor to recover actual damages stemming from a willful violation of the automatic stay. An award of actual damages may include lost wages or earnings, the cost of repairing damaged fixtures, or the fair market value of lost or destroyed property.[28] The debtor bears the burden of proof on the issue of actual damages. *In re Vu,* 591 B.R. at 605;

---

[28] *Iskric v. Commonwealth Fin. Sys. (In re Iskric),* 496 B.R. 355, 364 (Bankr. M.D. Pa. 2013) (awarding lost earnings); *Auyeung v. Christensen (In re Auyeung),* Bankr. No. 09-35065-E-13, Adv. No. 10-2497, 2012 WL 8143366, at *9-10 (Bankr. E.D. Cal. April 11, 2012); *In re Seaton,* 462 B.R. 582, 596-97 (Bankr. E.D. Va. 2011) (citing numerous cases valuing damages for lost property as fair market value of that property); *Lankford v. Advanced Equities, Inc.,* 305 B.R. 297, 302 (Bankr. N.D. Iowa 2004) (awarding damages for lost/damaged personal property); *In re Rivers,* 160 B.R. 391, 393 (Bankr. M.D. Fla. 1993) ("The correct measure of damages for loss of household goods is fair market value."); *B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust,* 97 B.R. 808, 816 (Bankr. E.D. Pa. 1989); *see also In re Harrison,* No. 18-50089-KKS, 2019 WL 1267797, at *8 (Bankr. N.D. Fla. March 8, 2019) (awarding $400 in actual damages to replace doorknob broken as a result of stay violation); *Mercer v. D.E.F., Inc.,* 48 B.R. 562, 565 (Bankr. Minn. 1985) (awarding damages for cost of replacing door damaged from stay violation).

*Iskric v. Commonwealth Fin. Sys. (In re Iskric),* 496 B.R. 355, 364 (Bankr. M.D. Pa. 2013).

While the debtor need not employ intellectually sophisticated methodologies to prove the amount

of actual damages, the damages requested must be supported by concrete evidence and proven

with reasonable certainty, as mere speculation, guess, or conjecture will not suffice. *In re Vu,* 591

B.R. at 604; *Cal. Coast Univ. v. Aleckna (In re Aleckna),* 543 B.R. 717, 725 (Bankr. M.D. Pa.

2016); *In re Stamps*, No. 00B06684, 2000 WL 1706897, at *3 (Bankr. N.D. Ill. Nov. 14, 2000).

Often, the value of assets listed on the bankruptcy schedules serves as a starting point for

determining a lost or damaged item's fair market value for purposes of measuring actual

damages. *In re Seaton,* 462 B.R. 582, n.4 (Bankr. E.D. Va. 2011); *Lankford v. Advanced*

*Equities, Inc.,* 305 B.R. 297, 302 (Bankr. N.D. Iowa 2004). In addition, property owners are

competent to render an opinion on the value of their own property.[29] *Auyeung v. Christensen (In*

*re Auyeung),* Bankr. No. 09-35065-E-13, Adv. No. 10-2497, 2012 WL 8143366, at *9 (Bankr.

E.D. Cal. April 11, 2012); *see also B. Cohen & Sons Caterers, Inc. v. New Plan Realty Trust*, 97

B.R. 808, 816 (Bankr. E.D. Pa. 1989).

The Debtor seeks the following actual damages resulting from Mr. Zewdi's violation of

the automatic stay: (1) $1,700 in lost wages; (2) $9,714 in damage to property, including the

estimated amount required to repair the doorframes; and (3) $1,700 to repair and replace the

service wire cut by PECO. With regard to the Debtor's lost wages, the Debtor credibly testified

that he is employed at Thompson Construction and missed between nine and eleven days of

work due to his understandable fear of Mr. Zewdi's return while he was not home. The Debtor's

testimony further reflected that had he worked, he would have earned $17/hour and worked

---

[29] All that is required to testify to the value of property is some acquaintance with it sufficient to form an estimate
value. *In re Auyeung,* 2012 WL 8143366, at *9. The court determines the appropriate weight to attach to that
estimate. *Id.*

between eight and twelve hours per day. In light of this range, the Debtor's request to recover

lost wages for ten days involving ten hours of work per day is reasonable, and the Court will

award $1,700 for lost wages.

With regard to the requested $9,714 in property damages, the Court credits the $2,210

value of the property referenced in Schedule B as the appropriate estimated collective fair market

value of the items contained therein, including four televisions, one couch, two beds, a stove, a

refrigerator, two microwaves, a laptop, a tablet, and used clothing. The Court only makes a slight

downward adjustment to $2,000 to account for the television that the Debtor was able to retrieve

from the Property. However, because the refrigerator, two microwaves, and one bed are already

accounted for in Schedule B, the Debtor cannot also recover the replacement value of those items

as he requests. To permit him to do so would be to allow a double recovery. The estimated fair

market value he gave these items in Schedule B is the closest reflection of the value of his

economic loss from the stay violations. *See e.g., In re Seaton,* 462 B.R. at 596-98; *In re Davis,*

62 B.R. 345, 347 (Bankr. S.D. Ohio 1986) (awarding actual damages in amount that the personal

property was valued on the schedules).

As for the fixtures, the Court credits the Debtor's estimated cost to repair and replace the

cabinets, the electric heaters, damaged doorframes, and damaged locks, as the Debtor is most

competent to testify as to the cost to repair and replace those items. Therefore, the Court will

award $7,779 on account of property damages stemming from the stay violations.[30] Finally, the

---

[30] The Court does not credit Mr. Zewdi's claims that he did not recall seeing cabinets, electric heaters, a laptop, or a king sized bedframe, box spring, or mattress for several reasons. First, Mr. Zewdi was not the only person removing the Debtor's belongings. Another person could have removed those items from the Property and thrown them into the trash truck. Furthermore, there would have been no reason for Mr. Zewdi to pay attention to the specific items he was throwing out. These items would have had much more meaning to the Debtor and, as already mentioned, he is competent to testify to the items which he lost as a result of the stay violation. Moreover, the Court found the Debtor's testimony on these items to be credible. Therefore, the Court fully credits the Debtor's testimony as to the items he lost as a result of the stay violation.

Court will award the $1,700 that the Debtor expended to restore the wire service cut by PECO as a result of Mr. Zewdi's call to the Neighbor.[31]

### 1. Emotional Distress Damages

The Debtor requests $18,000 in damages for the emotional distress that Mr. Zewdi's actions caused the Debtor. The Third Circuit has ruled that a debtor may recover damages for emotional distress caused by a willful stay violation as an element of actual damages under §362(k). *In re Lansaw*, 853 F.3d at 668; *In re Vu*, 591 B.R. at 605. The Third Circuit has declined to adopt a bright-line rule requiring the introduction of corroborating medical evidence to prove emotional harm and causation.[32] *In re Lansaw*, 853 F.3d at 669; *In re Vu*, 591 B.R. at 605. In fact, "where a stay violation is patently egregious, a claimant's credible testimony alone can be sufficient to support an award of emotional distress damages." *Lansaw*, 853 F.3d at 669; *In re Vu*, 591 B.R. at 606.

As discussed above, Mr. Zewdi's stay violations were patently egregious. The Debtor's credible testimony demonstrated that being wrongfully removed from the Property, having police threaten to arrest him if he returned to his own home, and watching helplessly as strangers threw substantially all of his personal possessions into a trash truck in front of his entire neighborhood deeply traumatized, shocked, humiliated, and upset the Debtor, as well as threatened his sense of safety and security. In fact, the Debtor's constant fear that Mr. Zewdi would return interfered with his sleep and prevented him from going to work. Intense anxiety stemming from the stay

---

[31] While the Court recognizes that Mr. Zewdi's actions may result in the Debtor incurring liability for damages suffered by Mr. Nelson as an invitee to the Property under Pennsylvania law, any claim Mr. Nelson may have against the Debtor is currently too contingent, speculative, and uncertain to justify awarding the Debtor actual damages on account of it at this time, especially given that Mr. Nelson has not filed a postpetition administrative claim in this case. *See Carrender v. Flitterer*, 503 Pa. 178, 469 A.2d 120, 123 (Pa. 1983) (property possessor has duty to protect invitees from reasonably foreseeable harm).

[32] A debtor is not required to prove that a stay violation was the *only* cause of the emotional distress. *Dawson v. Wash. Mut. Bank (In re Dawson)*, 346 B.R. 503, 512 (Bankr. N.D. Cal. 2006). Causation requires only proof that the offending conduct was a substantial factor in the emotional distress. *Id.*

violations even landed the Debtor in the hospital and elevated his blood pressure. Therefore, the

Debtor's credible testimony has established that that Mr. Zewdi's patently egregious willful stay

violations caused the Debtor significant emotional harm, entitling him to recover emotional

distress damages.

In light of other comparable cases awarding emotional distress damages,[33] the Court finds

$15,000 to be a reasonable amount to compensate the Debtor for the obvious emotional harm the

stay violations caused him. Even though the Debtor regained possession of the Property after a

relatively short period, other factors, such as Mr. Zewdi's aggressive conduct, the involvement of

law enforcement, and the permanent loss of nearly all of his personal possessions and those of

his housemate would necessarily cause a greater degree of emotional distress, warranting an

award on the higher end of the acceptable range.

## 2. Attorneys' Fees and Costs

As the final element of actual damages resulting from the stay violations, the Debtor

requests that the Court award $24,279 in attorneys' fees and costs to his counsel to compensate

his attorney for over 57 hours of time spent on this matter. Reasonable and necessary attorneys'

fees and costs are recoverable under §362(k) as actual damages. *In re Vu,* 591 B.R. at 606; *In re*

---

[33] *See e.g., In re Harrison,* 2019 WL 1267797, at *9, 13 (awarding $10,000 in emotional distress damages where debtor credibly testified she was traumatized, anxious, threatened, and paranoid as a result of creditor selling debtor's residence at a foreclosure sale, denying her access to the property for 94 days, and calling police to her home for trespassing); *Lansaw v. Zokaites (In re Lansaw),* Bankr. No. 06-23936-TPA. Adv. No. 13-2037-TPA, 2015 Bankr. LEXIS 106, at *34 (Bankr. M.D. Pa. Jan. 14, 2015) (finding an award of $10,000-$12,000 in emotional distress damages appropriate where debtor experienced nightmares, fear, loss of trust, depression, and stress as a result of being physically threatened by the creditor and locked out of her daycare business for a short time); *In re Trueman,* No. 14-15648-MKN, 2015 Bankr. LEXIS 4573, at *31 (Bankr. D. Nev. Feb. 12, 2015) (awarding $25,000 in emotional distress damages where debtor's unexpected, unauthorized eviction by law enforcement and creditor's two-week retention of her personal belongings caused anxiety, fear, anger, and hopelessness); *In re Dawson,* 346 B.R. at 511-12 (awarding $20,000 in emotional distress damages where creditor refused to rescind a foreclosure sale for five months and improperly filed an unlawful detainer, causing fear of homelessness); *Smith v. Homes Today, Inc. (In re Smith),* 296 B.R. 46, 55-56 (Bankr. M.D. Ala. 2003) (awarding $25,000 in emotional distress damages where as a result of repossession of debtor's mobile home, debtor became homeless, lost her job, had all her personal property lost or destroyed, suffered humiliation and depression, and had to seek psychiatric treatment).

*Manley Toys Ltd.,* No. 16-15374, 2018 WL 3213710, at *3 (Bankr. D. N.J. June 21, 2018). If litigation is necessary to afford a complete remedy to the debtor, §362(k) allows a judgment for the attorneys' fees and costs incurred prosecuting it. *Springer v. RNBJ RTO LLC, (In re Springer),* Bankr. No. 15-33254, Adv. No. 16-3007, 2017 WL 3575859, at *5 (Bankr. W.D. Ky. Aug. 16, 2017); *In re Crowder,* No. 16-20440-PRW, 2016 Bankr. LEXIS 2307, at *7-8 (Bankr. W.D. N.Y. June 16, 2016) ("Attorneys' fees…may qualify as actual damages under §362(k) when they are necessary to stop an ongoing stay violation, undo the effects of a stay violation, or recover pre-litigation actual damages.").

In addition, the Court follows those courts which have allowed compensation to *pro bono* counsel for their efforts to remedy egregious stay violations without regard to the ability of their clients to pay. *In re Vu,* 591 B.R. at 606-07 ("Plaintiff's counsel approached her client's pauperism with nobility and did not charge…additional thousands of dollars. I will not follow the courts who require that counsel actually bill their clients without regard to their poverty…"); *In re Parks*, No. 07-18341, 2008 WL 2003163, at *7 (Bankr. N.D. Ohio, May 6, 2008) ("Nor does counsel's agreement to represent the debtor *pro bono* mean that counsel cannot be awarded attorney's fees under fee-shifting statutes such as 11 U.S.C. § 362(k)(1).").

The Court finds the amount requested, and time spent, on this matter reasonable given the repeated, egregious stay violations. Because Mr. Zewdi refused to stop interfering with the Debtor's possession of his real and personal property against his own counsel's advice, Debtor's counsel was forced to speak to the police, file an emergency motion, and participate in an emergency hearing. Furthermore, considering that the Debtor lost substantially all of his personal property as a result of Mr. Zewdi's conduct, the Debtor has been forced to attempt to recover the extensive damages he suffered, making two subsequent lengthy hearings – one on liability and

one on damages – necessary. To adequately prepare for these hearings, Debtor's counsel had to draft and file briefs, collect extensive evidence, and present a series of witnesses at multiple hearings, all of which took significant time and effort to coordinate. Given the complexity of this case, the Court finds that the hours spent by Debtor's counsel litigating this matter are more than reasonable.[34] *See In re Manley Toys Ltd.,* 2018 WL 3213710, at *6 (hours expended for complex cases involving willful stay violations rarely exceed 60-70 hours and total fees rarely exceed $20,000-$30,000). Debtor's counsel has justified her hourly rate as within the appropriate range for an attorney with her experience practicing in Philadelphia. *See* Decl. re Attys' Fees ¶ 6, Ex. A, B. Therefore, the Court will award Philadelphia Legal Assistance attorneys' fees and costs in the amount of $24,279.00.

### D. Punitive Damages

In addition to actual damages, §362(k) allows for the recovery of punitive damages in "appropriate circumstances." Punitive damages may be awarded to punish outrageous conduct and to deter similar conduct by the creditor and others in the future. *In re Vu,* 591 B.R. at 607-08; *In re Iskric,* 496 B.R. at 365. To recover punitive damages, the debtor must prove that the offender acted with actual knowledge that he was violating a protected right or with reckless disregard of whether he was violating the debtor's rights. *In re Gardner*, 15–15192(MBK), 2016 WL 1576700, at *7 (Bankr. D. N.J. March 31, 2016); *In re Dean,* 490 B.R. at 671. Punitive damages are especially appropriate when a creditor has acted in "arrogant defiance" of the Bankruptcy Code. *In re Dean,* 490 B.R. at 671. Factors traditionally considered in determining whether to award punitive damages include: (1) the nature of the offender's conduct; (2) the

---

[34] Counsel's timesheets reflect that all entries relate to actions necessary to stop and remedy Mr. Zewdi's stay violations. *See* Decl. re Attys' Fees Ex. C.

offender's motives; (3) any provocation by the debtor; and (4) the offender's ability to pay. *In re Vu,* 591 B.R. at 607; *In re Iskric,* 496 B.R. at 365.

Applying these factors to this case establishes that the Debtor is entitled to recover punitive damages. First, the nature of Mr. Zewdi's conduct was deliberate, reprehensible, and unjustifiable. He "arrogantly defied" the Bankruptcy Code at every turn. Despite his own counsel's repeated warnings that he was not permitted to take any action to secure possession of the Property, he continued using the police to wrongfully force the Debtor out of his home under threat of arrest and throwing his belongings into a trash truck. In fact, Mr. Zewdi continued to dispose of the Debtor's belongings even *after* the emergency hearing when this Court told him he was prohibited from doing so. Mr. Zewdi simply did not care that his actions violated the Debtor's rights. His attitude at the damages hearing demonstrated a troubling lack of remorse for his outrageous actions, convincing the Court that punitive damages are necessary.

Second, Mr. Zewdi's motives were simple – he wanted to obtain possession of the Property at any cost, even though he had no legal right to do so at the time, and had no regard for the impact that his actions had on the Debtor. Third, there is no evidence that the Debtor took any actions which would have provoked or justified Mr. Zewdi's egregious conduct. Ultimately, Mr. Zewdi was unhappy and frustrated that the Debtor had obtained the right to redeem the Property and subsequently filed for bankruptcy on the last day of the redemption period, both of which the Debtor had every right to do. The Debtor's exercise of his legal rights does not amount to a provocation, even if they were exercised on the last day of the redemption period.[35]

Finally, with regard to Mr. Zewdi's ability to pay a punitive damages award, the ability to pay factor is more relevant to the Court's determination of the appropriate amount of damages

---

[35] To the extent that Mr. Zewdi was "provoked" by any alleged missed redemption payments, failure to repay a debt does not constitute "provocation" sufficient to prevent a punitive damages award. *In re Dean,* 490 B.R. at 674.

than to the determination of whether the offender's conduct merits imposition of punitive damages. *In re Dean,* 490 B.R. at 672 n. 5. That said, although Mr. Zewdi borrowed some of the funds to purchase the Property, he also has a full-time job, has made several expensive trips between California and Pennsylvania, and has hired two separate attorneys in this matter, likely paying at least several thousand dollars in retainer fees to do so, suggesting that he has some ability to pay a punitive damages award.

In determining the appropriate amount of punitive damages, the Third Circuit calls on courts to consider (1) the degree of reprehensibility of defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between punitive damages awarded and civil penalties authorized in comparable cases.[36] *In re Lansaw*, 853 F.3d at 671. While there is no precise formula, punitive damage awards which are single digit multiples of actual damages, including emotional distress damages, are more likely to withstand constitutional scrutiny and comport with due process. *In re Harrison,* 2019 WL 1267797, at *10 (noting that the Supreme Court has held single digit ratios between actual and punitive damages are constitutional); *In re Gardner,* 2016 WL 1576700, at *9 (citing *State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 426 (2003)); *see also In re Lansaw*, 853 F.3d at 671 (approving 4-1 ratio between punitive and actual damages).

In light of other comparable cases awarding punitive damages,[37] the Court finds an award of $20,000 to be reasonable given Mr. Zewdi's financial situation as well as the patently

---

[36] The Bankruptcy Code does not prescribe any statutory penalty for violation of the automatic stay. *Kaufman v. Monte (In re Kaufman),* 315 B.R. 858, 873 (Bankr. N.D. Cal. 2004).

[37] *See e.g., In re Lansaw*, 853 F.3d at 671 (affirming punitive damages award of $40,000, four times the amount of actual damages, where landlord repeatedly attempted to intimidate the debtor by entering her daycare business during business hours, threatening her, and locking her out of the daycare); *In re Harrison,* 2019 WL 1267797, at *10-11, 13 (Bankr. N.D. Fla. March 8, 2019) (awarding $35,100 in punitive damages, 3.375x the amount of actual damages against a major developer who had caused a foreclosure sale of debtor's home, denied her access to her

reprehensible nature of his actions. This award amounts to less than a 1:1 ratio to actual damages

suffered, well within the acceptable range.[38] Many of the factors which tend to justify higher

punitive damages awards, including repeated, knowing stay violations, wrongful removal of the

Debtor from his residence, harassment, and disposal of all or substantially all of a debtor's

personal property are present in this case. The Court does not issue this award lightly and only

does so in light of the repeated, offensive actions taken by Mr. Zewdi in this case.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Mr. Zewdi willfully violated the automatic

stay and, therefore, the Debtor is entitled to an award of $70,458 in damages, consisting of

$11,179 in financial damages, $15,000 in emotional distress damages, $24,279 in attorneys' fees

and costs to be awarded to Philadelphia Legal Assistance, and $20,000 in punitive damages.

Date: May 14, 2019                                _____
                                                  Honorable Ashely M. Chan
                                                  United States Bankruptcy Judge

---

home for 94 days, and continued to harass Debtor once she returned); *In re Vu,* 591 B.R. at 608 (awarding $5,000 in
punitive damages compared to $7,250 in actual damages where defendant locked debtor out of his restaurant
business two days before surrender and prevented him from retrieving his personal property and financial records);
*In re Wilson,* 15–51532 MPP, 2016 WL 3303325, at *11 (Bankr. E.D. Tenn. June 7, 2016) (awarded $5,000 in
punitive damages compared to over $13,000 in actual damages where landlord, who presented evidence of inability
to pay, repeatedly entered debtors' home without permission, wrongfully secured a default judgment in landlord
tenant court, and evicted them on their son's 16th birthday); *In re Trueman,* 2015 Bankr. LEXIS 4573, at *35
(awarding $15,000 in punitive damages compared to $25,000 in actual damages where landlord unexpectedly
evicted debtor and her family and prevented retrieval of personal belongings for two weeks); *In re Iskric,* 496 B.R.
at 365-66 (awarding $30,000 in punitive damages, a 3-1 ratio to actual damages, where defendant had been a
defendant in three separate adversary proceedings for willful stay violations and had failed to vacate a state civil
court order which resulted in a bench warrant being issued against debtor and her arrest for civil contempt); *In re
Smith,* 296 B.R. at 56-58 (awarding punitive damages of $25,000, slightly less than a 1 to 1 ratio to actual damages,
where debtor's mobile home was repossessed, destroying her personal property in the process, and rendering the
home uninhabitable); *In re Toll,* 175 B.R. 406, 408-09 (Bankr. N.D. Ala. 1994) (awarding $10,000 in punitive
damages, twice the amount of actual damages, where creditor broke into debtors' home, took all of their
possessions, and "wreaked havoc" on the premises); *B. Cohen,* 97 B.R. at 818 (awarding $10,000 in punitive
damages against large realty trust for "reprehensibly" destroying $50,000 worth of personal property of its long-time
tenant in complete disregard for the stay, state law, and debtor's interests, thereby committing a "figurative
homicide" on the debtor's business and reorganization efforts.).
[38] This calculation mirrors the method of calculating the ratio employed by the Debtor in the Damages Statement
and thus only considers property damage, lost wages, the cost to restore electrical service, and emotional distress
damages as actual damages for purposes of calculating the ratio.